**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT**

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

ANDREW BESHEAR, et al.

*Defendants*.

Case No. 3:25-cv-00028-GFVT

**BRIEF OF AMICUS CURIAE PUBLIC JUSTICE**

## INTRODUCTION

Twenty-three years ago, the Kentucky Council on Post-Secondary Education ("CPE") passed a regulation that allows undocumented immigrants who graduate local high schools to pay the same in-state tuition for public colleges or universities as their high school classmates do. Like almost two dozen other states with similar laws, CPE designed the regulation to comport with two 1996 federal laws that outline when and how states may provide benefits to undocumented immigrants. Countless people have graduated college thanks to the rule. A few months ago, the federal government decided the regulation "violated" federal law all along. Am. Compl. 13, Dkt. No. 4. On June 17, it filed this case against CPE and its president, along with the governor, to "declare the rule illegal" and enjoin its "enforcement." *Id.* at 2, 13.

The problem for the government is that CPE does not enforce the regulation. Kentucky's state institutions, not CPE, determine which students qualify for in-state rates and bill those students accordingly. 13 Ky. Admin. Regs. 2:045 § 12(4). With no "enforcement" to block, an injunction against CPE would effectively "amount to an advisory opinion." *California v. Texas*, 593 U.S. 659, 672-73 (2021) (citation modified). The Court lacks jurisdiction to issue those. *See id.* While such a ruling would place judicial weight behind the government's newfound reinterpretation of the law, it would exceed the "judicial power" the framers so carefully limited when they designed our democracy. *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).

Rather than raise that basic jurisdictional problem—or any of the other problems that plague this suit on the merits—CPE has taken the government's side. Two weeks ago, the agency signed a four-page Motion for Consent Judgment in which

it agreed with all the government's claims and endorsed all the relief the government requested. To the extent CPE *could* enforce the challenged rule, no one claims it would do so now. That compounds the jurisdictional problem. Federal courts do not have the power to invalidate state laws on which countless people rely when the only two parties before the Court agree on everything and seek precisely the same result. The Constitution limits federal courts to deciding "actual controversies arising between adverse litigants," not one-sided requests for advisory judgments. *Muskrat v. United States*, 219 U.S. 346, 361 (1911). The Court lacks jurisdiction for that reason, too.

Even if the Court had jurisdiction, it should decline to exercise it. The parties ask the Court to nullify a longstanding, lawfully enacted regulation, with cousins in almost two dozen states, without hearing any defense of the law from the people it actually affects: the young people who need equal access to in-state tuition to afford a college education. The Court should not pass judgment on such a consequential law without any adversary briefing that would present both sides of the issue.

Because it lacks jurisdiction, the Court should deny the joint motion for a consent decree and dismiss this case. If it does not dismiss the case, it should allow Kentucky Students for Affordable Tuition to intervene to defend the regulation.

## BACKGROUND

In 1996, Congress passed two statutes that restrict undocumented immigrants' eligibility for certain state benefits. The first, the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), provides that states may not make

undocumented immigrants eligible for a postsecondary educational benefit "on the basis of residence within a state," "unless a citizen or national of the United States is eligible for such benefit (in no less an amount, duration, and scope) without regard to whether [he] is such a resident." 8 U.S.C. § 1623(a). The second, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), states that "[a] State may provide" that an undocumented immigrant is eligible for a statutorily defined "public benefit" "only" through a state law enacted "after August 22, 1996" that "affirmatively provides for such eligibility." 8 U.S.C. § 1621(d).

In the ensuing years, over two dozen states passed laws that allow state colleges and universities to charge undocumented students in-state tuition rates. Nat'l Immigration L. Center, *Basic Facts About In-State Tuition for Undocumented Students* (June 3, 2024), https://perma.cc/JU9M-ATLA. To avoid any conflict with federal law, these state laws determine eligibility based on criteria that does not depend on "residence within a state." 8 U.S.C. § 1623(a); *see* Nat'l Immigration L. Center, *supra*, at 1, 3. Against that background, in 2002, the Kentucky Council on Post-Secondary Education ("CPE") passed the regulation at issue here, which provides that an undocumented student qualifies for in-state college tuition if they "graduate[d] from a Kentucky high school," even if they reside in another state. Ky. Admin. Reg. 749-751 (2002) (codified at 13 Ky. Admin. Regs. 2:045 § 8(4)(a)).

Although CPE promulgated the regulation, it does not enforce the regulation. The regulation provides that Kentucky colleges and universities make the "final" determination as to whether their students qualify for in-state tuition "with no appeal

to [CPE]." 13 Ky. Admin. Regs. 2:045 § 12(4); *see also id.* § 1(5) (providing that "postsecondary education institution[s]" determine "residency status"); *id.* § 1(10) (defining "Kentucky resident" to mean "a person determined by an institution" to be a Kentucky resident under the regulation); *id.* § 3 (prescribing standards for a determination of residency status "by an institution").

Like many similar laws around the country, the regulation has been in effect for over two decades. A few months ago, the federal government decided that the regulation conflicts with IIRIRA and PRWORA. On June 17, 2025, it sued the governor of Kentucky, CPE, and CPE's president[1] in federal court. The amended complaint asks the Court to (1) declare that the regulation "violates the Supremacy Clause and is therefore unconstitutional and invalid" and enjoin the defendants "from enforcing the challenged provision." Am. Compl. 13, Dkt. No. 4. The suit mirrors recent cases the government has filed in Oklahoma and Texas, where it "partner[ed]" with friendly state attorneys general to invalidate similar state laws by consent decree.[2]

On July 15, Governor Beshear filed a motion to dismiss because he does not enforce the challenged regulation. Dkt. No. 11. The United States later agreed to dismiss him from the case and the Court did so on August 22. Dkt. No. 23. That same day, the United States and CPE filed a joint motion for a consent decree. Joint Mot.

---

[1] This brief refers to CPE and its president collectively as "CPE."

[2] Off. of the Okla. Att'y Gen., "Trump DOJ and Drummond partner to end in-state tuition for illegal immigrants," Oklahoma.gov (Aug. 5, 2025), https://perma.cc/Z3BL-PPW7; Sarah Weissman, Texas Ends In-State Tuition for Undocumented Students, Inside Higher Ed (June 5, 2025), https://perma.cc/H2NX-C2QS.

for Entry of Consent Judgment, Dkt. No. 24 ("Joint Mot."). The motion is four pages long. *Id.* It contains no legal analysis and no description of any negotiations that preceded it. *See id.* Instead, it simply states that CPE agrees with all the U.S. government's claims and consents to all the relief it seeks. *See id.* Kentucky Students for Affordable Tuition, a student association with undocumented members who rely on the regulation to pay affordable tuition at Kentucky colleges, then moved to intervene. Dkt. No. 27-1 at 8. Those motions are pending.

**ARGUMENT**

A court may enter a consent decree only if it "spring[s] from, and serve[s] to resolve, a dispute within the court's subject-matter jurisdiction." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004). When concerns arise about the court's subject matter jurisdiction, courts "are obligated to consider" them "*sua sponte*," *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012), because a lack of subject matter jurisdiction "deprives courts of power to hear the case, thus requiring immediate dismissal." *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 297 (2023).

The Court lacks jurisdiction here. ***First***, the federal government lacks standing because it does not allege CPE enforces the regulation in any way, meaning that CPE inflicts no injury the Court can redress. ***Second***, the parties are not adverse: Unlike a typical consent decree, which reflects a compromise between adverse litigants, Defendants agree to everything in the government's complaint and jointly seek the relief the government wants: invalidation of a legally enacted regulation. ***Third***, even

if the Court *could* hear this case, prudential considerations direct that the Court should not declare a law invalid without hearing any argument in its defense.

## I. The Court lacks Article III jurisdiction to hear this case.

Article III limits federal courts to deciding "cases" or "controversies," U.S. Const. Art. III § 2: that is, "genuine, live dispute[s] between adverse parties," *Carney v. Adams*, 592 U.S. 53, 58 (2020), "of the sort traditionally amenable to, and resolved by, the judicial process," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). That bedrock principle maintains the separation of powers. It "ensur[es] that the Federal Judiciary respects 'the proper—and properly limited—role of the courts in a democratic society.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quoting *Allen v. Wright,* 468 U.S. 737, 750 (1984)). And it "sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *GTE Sylvania, Inc. v. Consumers Union of U. S., Inc.*, 445 U.S. 375, 382 (1980) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

### A. The United States lacks standing.

"A case or controversy can exist only if a plaintiff has standing to sue." *United States v. Texas*, 599 U.S. 670, 676 (2023). Because "standing is an essential and unchanging" element of Article III jurisdiction, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), even the U.S. government must demonstrate standing to sue in federal court. *See United States v. West Virginia*, 295 U.S. 463, 474 (1935) (holding that the United States lacked standing to sue for the court to resolve a "difference of

opinion" about the "power and authority" of the United States vis-à-vis a state); 14 Wright & Miller's Federal Practice & Procedure § 3652 (4th ed.).

To invoke this Court's jurisdiction, then, the government "must show an injury in fact caused by the defendant and redressable by a court order." *Texas*, 599 U.S. at 676. The injury must be "actual" or imminent." *Lujan*, 504 U.S. at 560. But it is not enough for the government to show only injury: the "injury must be legally and judicially cognizable." *Texas*, 599 U.S. at 676. This requires that the dispute be "traditionally thought to be capable of resolution through the judicial process—in other words, that the asserted injury [be] traditionally redressable in federal court." *Id.* at 676 (citation modified). A "favorable decision" must be "'likely' to provide effectual relief.'" *Id.* (Gorsuch, J., concurring) (quoting *Lujan*, 504 U.S. at 561).

The complaint alleges no redressable injury. It asserts only that the regulation "conflicts with federal immigration law." Am. Compl. 2. But a bare conflict of law does not create a "case or controversy." "The party who invokes the [judicial] power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement." *Mellon*, 262 U.S. at 488. The government has not made that showing.

**1. To have standing, the government must show that CPE enforces the challenged regulation.**

Without a threat of enforcement, a conflict of law is not a "judicially cognizable" injury that federal courts can redress. *Texas*, 599 U.S. at 676. As the Supreme Court has long held, a federal court has "no right to pronounce an abstract opinion upon the constitutionality of a state law." *Mellon*, 262 U.S. at 484 (quoting *Cherokee Nation v.*

*State of Georgia*, 30 U.S. 1, 75 (1831)). So it cannot entertain a proceeding against a government when "the only judgment required is to settle the doubtful character of the legislation in question." *Muskrat*, 219 U.S. at 361.

That the U.S. government, rather than a private party, wants to challenge the state law does not change matters. As the Supreme Court determined "early and wisely," a federal court "cannot give advisory opinions even when asked by the Chief Executive." *Clinton v. Jones*, 520 U.S. 681, 701 n.33 (1997) (quoting *Chicago & Southern Air Lines v. Waterman S. S. Corp*. 333 U.S. 103, 113 (1948)). So even the federal government cannot ask the courts to resolve a "difference of opinion" about the "power and authority" of the United States vis-à-vis a state. *West Virginia*, 295 U.S. at 473. If the United States could pop into federal court for a ruling whenever a state passes a law that arguably conflicts with a federal statute, it could enlist the federal courts in "amorphous general supervision of the operation of government," *Raines v. Byrd*, 521 U.S. 811, 829 (1997)—here state government—even without any live controversy. That would exceed the judicial role in the federal system.[3]

[3] Although the government has standing to bring criminal prosecutions to vindicate the "injury to its sovereignty arising from violation of its laws," *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000), a state does not "violate" federal law, as a criminal defendant does, whenever it passes a law that conflicts with federal law. The Supremacy Clause does not make state legislators outlaws. It merely "creates a rule of decision": "Courts" "must not give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). But the U.S. government cannot forbid a state from passing a law in the first place. It cannot "issue direct orders" to state governments or "dictate[ ] what a state legislature may and may not do." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471, 474 (2018). Because state lawmaking alone—without enforcement—cannot "violate" federal law, it cannot inflict a redressable injury on the United States.

To show judicially cognizable injury, then, the government must "assert an injury that is the result of a statute's actual or threatened *enforcement*" by the defendant. *California v. Texas*, 593 U.S. 659, 672 (2021). That means the defendants must "possess authority to enforce the complained-of provision." *Durham v. Martin*, 905 F.3d 432, 434–35 (6th Cir. 2018) (quoting *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014)). "[A] plaintiff lacks standing when it fails to allege that the defendant "can and may take some enforcement action . . . ." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1032 (6th Cir. 2022); *see also Lewis v. Governor of Alabama*, 944 F.3d 1287, 1299 (11th Cir. 2019) (collecting cases).

If the defendant is unlikely to enforce the regulation, the Court cannot grant relief that would have a real-world effect. "[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves." *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021). When it enters an injunction, "the court enjoins, in effect, not the execution of the statute, but the acts of the official, the statute notwithstanding." *Mellon*, 262 U.S. at 488. To find standing to challenge a law the defendant does not enforce, then, "would allow a federal court to issue what would amount to 'an advisory opinion without the possibility of any judicial relief'"—exactly what Article III is designed to prevent. *California*, 593 U.S. at 672-73.

**2. The government has not shown that CPE enforces the regulation.**

Here, the U.S. government does not allege CPE does anything to enforce the regulation. It admits that "Kentucky's postsecondary education institutions," not CPE, "are responsible for making the initial determination of whether a student

qualifies as a Kentucky resident for purposes of admission and tuition assessment." Am. Compl. ¶ 22. In fact, Kentucky's state institutions also make the "final" determination of whether their students qualify for in-state tuition, "with no appeal to the [CPE]." 13 Ky. Admin. Regs. 2:045 § 12(4)(a). Although the CPE's regulations govern those residency determinations, *see* 13 Ky. Admin. Regs. 2:045, § 1(5); Ky. Rev. Stat. Ann. § 164.030, the fact that a law or regulation may bind non-defendant state officials does not give courts the power to enjoin "the laws themselves," as opposed to the acts that enforce them. *Jackson*, 141 S. Ct. 2494. Because the government does not point to anything the CPE does—or even could do—to coerce state universities (or anyone else) to comply with the regulation, there is nothing for the court to enjoin.[4]

Even if CPE had the power and occasion to enforce the regulation, the government has not shown that CPE would do so. To the contrary, the record suggests that CPE does not intend to apply the rule, which it has declared "preempted" and "invalid." Joint Mot. ¶¶ 9, 10. Because there is no imminent likelihood of enforcement, there is no Article III case or controversy for the court to resolve.

[4] State regulations do authorize CPE to conduct a "formal administrative hearing" to adjudicate eligibility for two special programs that allow Kentucky residents to attend *out-of-state* institutions at discounted rates. 13 Ky. Admin. Regs. 2:045 § 12(4)(b). But adjudication is not the same as enforcement. Judges do not "enforce" laws by interpreting them. *See*, e.g., *Lindke v. Tomlinson*, 31 F.4th 487, 493 (6th Cir. 2022) (holding that plaintiffs did not have standing to sue state judges because the judges merely adjudicated their legal rights; they did not enforce the challenged law). Similarly, CPE would not "enforce" the regulation by simply deciding whether a student meets its requirements for purposes of discounted tuition to out-of-state colleges. In any event, the government does not claim that any qualified undocumented students have applied—or are likely to apply—to the out-of-state programs. Nor does it show that CPE would be likely to apply the regulation to such a student, given that CPE believes the regulation is invalid.

Because the United States has not alleged that CPE is likely to (or even can) enforce the challenged regulation, an order declaring the law and policy preempted here would be nothing but an "advisory opinion." *California*, 593 U.S. at 672-73. To be sure, it would give the United States what it seeks: a court opinion to brandish as precedent when it attacks similar laws in other states. And it may prompt other institutions not to enforce similar state laws, making college unaffordable for students across the country. But the fact that judicial opinions carry such weight is exactly why courts should not step beyond their constitutional role to enter advisory opinions, "even when asked by the Chief Executive." *Clinton*, 520 U.S. at 701 n.33.

That is not to say a court could never decide whether the regulation is preempted. The same issue could easily arise in a justiciable dispute. For example, a university could agree with the government that federal law preempts the regulation and deny an undocumented student the tuition discount. The student could then seek judicial review of that decision. *See* Ky. Rev. Stat. Ann. § 13B.140 (providing for judicial review of final agency orders). The reviewing court could then decide whether federal law preempts the rule with the benefit of adverse presentation, "which sharpens the presentation of issues" in "a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 486 (1982).

There is no such controversy here, however. The Court lacks jurisdiction.

**B. This case is not a cognizable dispute between adversaries.**

Because Article III demands live disputes between genuine adversaries, "there is no Art. III case or controversy when the parties desire 'precisely the same result.'" *GTE Sylvania, Inc.*, 445 U.S. at 382–83 (quoting *Moore v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 47, 48 (1971)); *see also Pool v. City of Houston*, 87 F.4th 733, 733–34 (5th Cir. 2023) ("It is well settled that, where the parties agree on a constitutional question, there is no adversity and hence no Article III case or controversy."). "If federal courts could "pass upon the constitutionality of legislation in a friendly, non-adversary" lawsuit, then "a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346 (1936) (Brandeis, J. concurring) (quoting *Chicago & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892)). That is not the system the founders designed.

This is just the kind of case that undermines that design. Despite strong arguments that the regulation is valid, both parties "agree on [the] constitutional question," *Pool*, 87 F.4th at 733: they agree that the regulation is "preempted" and "violates the Supremacy Clause," Joint Mot. ¶¶ 9-10. And both "desire exactly the same result," *Moore*, 402 U.S. at 48: a declaration that the regulation is "invalid" and an injunction against its enforcement. *Id.* ¶¶ 10-11. Such a one-sided bid for relief "does not assume the honest and actual antagonistic assertion of rights to be adjudicated—a safeguard essential to the integrity of the judicial process, and one

which [the Court has] held to be indispensable to adjudication of constitutional questions." *United States v. Johnson*, 319 U.S. 302, 305 (1943).

Friendly suits like this one pose a special threat to democracy when they ask the court to wipe out laws or regulations with "far reaching effects on the public welfare" without any input from the people affected. *Johnson*, 319 U.S. at 305. Like Congress, state legislatures have prescribed procedures that agencies must follow before they can lawfully change binding regulations that affect the public. In Kentucky, agencies can repeal regulations only through a new regulation. *See* Ky. Rev. Stat. §§ 13A.310. And agencies cannot enact new regulations unless they meet stringent requirements, such as certifying that the regulation "[w]ill not have a major economic impact," or, if does, that the regulation is necessary to address "an imminent threat to public health, safety, or welfare," to prevent the loss of funds, to meet a statutory deadline, or to comply with a court order. *See* Ky. Rev. Stat. §§ 13A.105(2), 13A.120. Additionally, the administrative agency must hold a public hearing and accept written comments, *id.* § 13A.270, and submit the regulation for review by a subcommittee of the legislature to ensure it is not "deficient," *id.* § 13A.030. These requirements, enacted by the people's representative in the Kentucky legislature, ensure political accountability and operate as a check on unelected officials wielding lawmaking power. The public would lose these protections if the federal and state executives could skip the required procedures and effectively repeal a regulation by taking a quick trip to federal court without anyone to defend the rule.

This case illustrates why such an end-run is so dangerous. Here, the parties ask the Court to nullify a longstanding regulation on which many students' futures depend based on a meritless legal theory that no court has accepted in an adversary suit. Like the at least two dozen states with similar laws, CPE passed the regulation at issue *after* Congress enacted IIRIRA and PRWORA and designed it to be consistent with those statutes. The rule plainly does not award undocumented students benefits "on the basis of residence," 8 U.S.C. § 1623(a); it provides that universities may charge them in-state tuition if they "graduated from a Kentucky high school," regardless of where they reside, 13 Ky. Admin. Regs. 2:045 § 8(4)(a). And a state's decision to charge lower tuition does not provide "public benefits" within the meaning of the PRWORA, 8 U.S.C. § 1621(d), which covers only "monetary assistance paid to students or their households." *Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 605 (E.D. Va. 2004).[5] Even if PRWORA really commanded that "a State may [not] provide" such benefits by regulation, as the government claims, the statute would violate the Tenth Amendment. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S.

---

[5] This flows from the text of the statute. PRWORA's specifically defines "public benefit" with a list of examples that typically involve payment of funds or other in-kind benefits, such as "retirement, welfare, health, disability, public or assisted housing," "food assistance" and "unemployment benefits," "for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government." 8 U.S.C. § 1621(d). In statutory interpretation, "a word is known by the company it keeps," so courts "construe the list of words at issue as invoking their most general quality—the least common denominator, so to speak—relevant to the context." *In re McDaniel*, 973 F.3d 1083, 1097 (10th Cir. 2020). PRWORA's definition is thus best read to cover only postsecondary education benefits that share the same characteristics as the other benefits it lists: "'payment[s] or gift[s] such as financial help in time of sickness, old age, or unemployment.'" *Id.* at 1098 (brackets modified).

453, 471, 474, 480-81 (2018) (explaining that Congress may not "issue direct orders" to states that prohibit them from regulating in a certain way).

Indeed, the only appellate court to address a similar law has upheld it. *See Martinez v. Regents of Univ. of California*, 50 Cal. 4th 1277, 1290 (2010) (upholding state law that extended in-state tuition to undocumented students who "possess a California high school degree or equivalent," "file an affidavit stating that they will try to legalize their immigration status," and attended "[h]igh school ... in California for three or more years" was not preempted). Despite the decades that laws like this have been on the books, the government does not point to a single case holding that any similar law was preempted after adversarial briefing. Tellingly, the only courts to enjoin such a law's enforcement have done so by approving consent decrees with no adversary briefing just days after the government sued. *See* Order, *United States v. Oklahoma*, No. 25-cv-265 (E.D. Okla. Aug. 29, 2025), Dkt. No. 23; Order, *United States v. Texas*, No. 7:25-cv-55, Dkt. No. 8 (N.D. Tex. June 4, 2025).

This Court should not make the same mistake. Because no adversary dispute exists, the Court should dismiss the case for want of jurisdiction.

**C. The proposed decree is distinct from a typical consent decree.**

That the parties seek a consent judgment does not change the analysis. "[A] federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction." *Frew*, 540 U.S. at 437. This one does not.

A typical consent decree resolves "an ongoing controversy" between adverse parties. *NLRB v. Constellium Rolled Products Ravenswood, LLC*, 43 F.4th 395, 406

(4th Cir. 2022). The plaintiff has standing to seek the decree because they need it to prevent "future misconduct by [the defendant] that ha[s] to be addressed by an injunction." Laurence H. Tribe, American Constitutional Law Vol. I, § 3-12 p. 364 (3d Ed. 2000). And, with a typical consent decree, the parties are adverse: they do not "agree on [the] constitutional question," *Pool*, 87 F.4th at 733–34, or "desire precisely the same result" *GTE Sylvania, Inc.*, 445 U.S. at 382–83 (citation modified). They have engaged in arms-length negotiations to reach a compromise. *See Stotts v. Memphis Fire Dep't*, 679 F.2d 541, 551 (6th Cir. 1982) ("Before preliminarily approving a consent decree, a court must first determine that the decree is the result of good faith, arms-length negotiations."), *rev'd on other grounds*, *Firefighters Loc. Union No. 1784 v. Stotts*, 467 U.S. 561 (1984). And the Court often does not render an opinion on the merits, let alone invalidate a law wholesale.

The classic example is *Swift & Co. v. United States*. 276 U.S. 311 (1928). There, the parties entered a consent decree to resolve a live dispute in which the defendants expressly denied any wrongdoing. *Id.* at 320. Later, the defendants changed their minds and tried to collaterally attack the decree, arguing that the court lacked jurisdiction to enter the decree because, as part of the bargain, the government had "abandoned all charges the defendants had violated the law" in the past. *Id.* at 326. The Court found jurisdiction because the consent decree was designed "*to prevent [a] future wrong*"—a wrong in which the defendants would have engaged if the court had not entered the decree. *Id.* (emphasis added).

Here, in contrast, the government has alleged no "future misconduct by [CPE] that ha[s] to be addressed by an injunction." Laurence H. Tribe, American Constitutional Law Vol. I, § 3-12 p. 364 (3d Ed. 2000) (discussing *Swift*). As explained above, there is no suggestion that CPE will—or even can—enforce the regulation if the court declines to enter the decree. The parties agree on everything. There is no evidence they engaged in arms-length negotiations to compromise a real dispute. And here, unlike in *Swift*, the consent decree requires the court to declare a regulation preempted with no adversary briefing.[6]

In short, none of the elements that make consent decrees justiciable in the ordinary case exist in this one. The Court lacks jurisdiction.

**D. Even if the Court has jurisdiction, it should decline to hear the case.**

Even if the Court could exercise jurisdiction under Article III, it should still decline to opine on the regulation's validity because this case lacks an adversarial "presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Windsor*, 570 U.S. at 760 (quoting *Baker v. Carr,* 369 U.S. 186, 204 (1962)). In the alternative, if the Court exercises jurisdiction,

---

[6] That CPE would not and cannot enforce the regulation and agrees to the requested relief also distinguishes this case from *United States v. Windsor*, in which the requested relief would have ordered the government "to pay money that it would not disburse but for the court's order." 570 U.S. 744, 758 (2013). In that case, there was an "adequate basis for jurisdiction in the fact that the Government intended to enforce the challenged law" without a contrary judicial order. *Id.* at 759. Moreover, the "adversarial presentation of the issues [was] assured by the participation of *amici curiae* prepared to defend with vigor the constitutionality of the legislative act." *Id.* at 760. Unless the Court grants Kentucky Students for Affordable Tuition's request to intervene, there would be no such adversarial presentation here.

it should grant the motion to intervene so that the intervenors can defend the law on the merits. As the intervenors' motion demonstrates, students across the state, who know no home but Kentucky, rely on the regulation to afford college tuition. *See* Dkt. No. 3-4. Their futures depend on it, and their voices should be heard.

The Court should decline the invitation to rubberstamp a decree with such little support and such far-reaching consequences without adversarial presentation.

## CONCLUSION

The Court should deny the joint motion for a consent decree and dismiss the case. If it does not, it should allow Kentucky Students for Affordable Tuition to intervene to defend the regulation on which its members depend.

September 5, 2025

    Respectfully submitted,

    /s/ Corey M. Shapiro
    Corey M. Shapiro
    William E. Sharp
    Bethany N. Baxter
    ACLU of Kentucky Foundation
    325 W. Main Street, Suite 2210
    Louisville, KY 40202
    (502) 581-9746
    corey@aclu-ky.org
    wsharp@aclu-ky.org
    bbaxter@aclu-ky.org

    Sean Ouellette*
    Shelby Leighton*
    PUBLIC JUSTICE
    1620 L Street NW, Suite 630
    Washington, DC 20036
    Phone: (202) 797-8600
    souellette@publicjustice.net

*Counsel for Amicus Curiae*

**Motion for admission pro hac vice forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified in the Notice of Electronic Filing.

/s/ Corey M. Shapiro