UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

UNITED STATES OF AMERICA,                )
                                          )
        Plaintiff,                        )
                                          )        Case No. 3:25-cv-00028-GFVT
                                          )
V.                                        )
                                          )
                                          )
KENTUCKY COUNCIL ON                       )            **OPINION**
POSTSECONDARY EUCATION, *et al*.,         )               **&**
                                          )            **ORDER**
                                          )
        Defendants.                       )
                                          )

                    ***   ***   ***   ***

The Kentucky Council on Postsecondary Education promulgated a regulation that allows unlawful aliens[1] to qualify for in-state tuition at public Kentucky universities, provided they meet certain requirements.  The United States asserts that this regulation contravenes two federal laws.  Rather than defend its regulation, the Council made the choice to join the United States in moving for entry of consent judgment to invalidate the regulation.  [R. 24.]  Although the proposed consent decree seeks to accomplish something the parties could not attain outside of litigation, and thus violates state law, the Court must **GRANT** the Motion for Entry of Consent Judgment **[R. 24]** and **ADOPT** the proposed consent decree **[R. 24-1]** because it is necessary to remedy a violation of federal law.

---

[1] As a preliminary note on terminology, in this Opinion, the Court uses the term "unlawful alien" to refer to a non-United States citizen who is in the United States, but who lacks the immigration status required by federal law to be lawfully present in this country and who has not otherwise been admitted on a temporary basis as a nonimmigrant.  Intervenor-Defendant utilizes the term "undocumented immigrant" throughout briefing, which is not used in the relevant statutes and may lack nuance.  However, some may view the terms "alien" or "illegal alien," utilized in briefing by the United States, as pejorative.  This is certainly not the Court's intent.  Both relevant statutes use the phrase "alien who is not lawfully present in the United States," which the Court shortens to "unlawful alien" for purposes of this Opinion.

**I**

At the heart of this dispute lies two statutes, enacted by Congress in 1996, that limit unlawful aliens' entitlement to certain state benefits.  The first, the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) provides, in relevant part, that a state may not make unlawful alien "eligible on the basis of residence within a State. . .for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit. . .without regard to whether the citizen or national is such a resident."  8 U.S.C. § 1623(a).  The second, the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) provides that a State may provide a benefit to an unlawful alien "only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility."  8 U.S.C. § 1621(d).

Following the enactment of these statutes, many states, including Kentucky, enacted laws or regulations that tied eligibility for in-state tuition to high school attendance and graduation within the state, rather than residence within the state.[2]  In Kentucky, the Kentucky Council on Post-Secondary Education ("Council") is charged with defining residency for the purposes of tuition rates at public colleges and universities in Kentucky.  Ky. Rev. Stat. Ann. § 164.020(8)(a).  The Council is also given the authority to set different tuition amounts for Kentucky residents and for nonresidents.  *Id.*  Although the Council promulgates the regulations that guide the inquiry, the institutions themselves make the final determination regarding whether a student is a resident for purposes of in-state tuition.  [R. 56 at 5.]  Barring two exceptions that are not relevant here, a student may not appeal a residence determination to the Council.  *Id.*

---

[2] The Court does not intend to take a stance on the ultimate preemption issue with this statement, but rather to provide context as to how these law and regulations came to fruition.

Pursuant to its statutory charge, the Council promulgated the regulation that is the subject of this litigation, the Tuition Assessment Regulation. *See* 13 Ky. Admin. Regs. 2:045. Under this regulation, an unlawful alien who graduates from a Kentucky high school is considered a Kentucky resident for purposes of the Tuition Assessment Regulation. 13 Ky. Admin. Regs. 2:045(8)(4). The individual must also hold a visa, or be a dependent of a person who holds a visa. *Id.* This provision of the Tuition Assessment Regulation has been in effect since 2002. *Id.*

Precipitating this action, on February 19, 2025, President Donald J. Trump signed Executive Order 14218, *Ending Taxpayer Subsidization of Open Borders*, which ordered the heads of each executive department and agency to "ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens[.]" Exec. Order No. 14,218, 90 Fed. Reg. 10,581 (Feb. 25, 2025). On April 28, 2025, President Trump signed Executive Order 14,287, *Protecting American Communities From Criminal Aliens*, which directed executive officials to "take appropriate action to stop the enforcement of State and local laws, regulations, policies, and practices favoring aliens over any groups of American citizens that are unlawful, preempted by Federal law, or otherwise unenforceable, including State laws that provide in-State higher education tuition to aliens but not to out-of-State American Citizens." Exec. Order No. 14,287, 90 Fed. Reg. 18,761 (May 2, 2025).

Against this backdrop, the United States filed this action against the Council on Postsecondary Education and Dr. Robbie Fletcher, in his official capacity as Commissioner of Education for the Commonwealth of Kentucky,[3] on June 17, 2025, seeking to invalidate 13 Ky. Admin. Regs. 2:045(8)(4)(a) on the grounds that it is preempted by both IIRIRA and PRWORA, and thus violates the Supremacy Clause. [R. 1.] On June 23, 2025, the United States filed an

---

[3] The action was also brought against Andrew Beshear, Governor of the Commonwealth of Kentucky. [R. 1.] Governor Beshear was dismissed from this lawsuit on August 22, 2025. [R. 23.]

Amended Complaint which did not name Dr. Robbie Fletcher as a Defendant, and instead named Dr. Aaron Thompson, in his capacity as President of the Council on Postsecondary Education. [R. 4.]  The allegations otherwise remained unchanged.  *Id.*

On July 10, 2025, Russell Coleman, Attorney General for the Commonwealth of Kentucky, wrote a letter addressed to Dr. Thompson urging the Council to "withdraw its regulation rather than litigate. . .a losing fight."  [R. 11-2 at 3.]  Then, on August 22, 2025—prior to any responsive pleading by Dr. Thompson or the Council—the United States, Dr. Thompson, and the Council jointly moved for entry of a consent decree.  [R. 24.]  The parties jointly ask that this Court enter judgment declaring that 13 Ky. Admin. Regs. 2:045(8)(4)(a) violates the Supremacy Clause and is therefore invalid.  *Id.* at 2.  The parties also ask that the Court enter a permanent injunction prohibiting the Council, as well as their successors, agents, and employees, from enforcing the challenged provision of the Tuition Assessment Regulation.  *Id.* at 2-3.

On that same day, Kentucky Students for Affordable Tuition ("KSAT") moved to intervene to defend the challenged regulation.  [R. 27.]  The United States opposed KSAT's intervention, but the Court found that KSAT was entitled to intervene as of right.  [R. 34; R. 38.]  In its motion to intervene, KSAT indicated its opposition to the consent decree, so the Court ordered briefing on the matter in order to give KSAT the opportunity to voice its objection.  [R. 41.]  KSAT has now filed its response in opposition to the consent decree, and the United States filed its reply in support.  [R. 43; R. 48.]  Neither Dr. Thompson nor the Council filed a reply in support of the consent decree, and the time to do so has passed.  [*See* R. 41.]  To allow the parties to further develop their arguments, the Court set the matter for a hearing on March 12, 2026.  [R. 52.]  Plaintiff United States, Defendants Dr. Aaron Thompson and Council on Postsecondary Education, and Intervenor-Defendant Kentucky Students for Affordable Tuition

were present at the hearing.  [R. 53.]  The Court heard arguments from all parties, and the motion is now ripe for review.

## II

"[A] federal court is more than a 'recorder of contracts' from whom the parties can purchase injunctions; it is 'an organ of government constituted to make judicial decisions. . .'" *Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C v. City of Cleveland*, 478 U.S. 501, 525 (1986).  Of course, public policy generally favors voluntary settlement over prolonged, unnecessary litigation, and the Court clearly possesses the authority, as a matter of judicial administration, to dismiss an action once the parties reach a settlement.  *United States v. Lexington Fayette Urban Cnty. Gov't*, 591 F.3d 484, 490-91 (6th Cir. 2010); *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 380 (1994).  But a consent decree asks the Court for something more: continued judicial supervision over hypothetical future events.

In that way, "[a] consent decree is a strange hybrid in the law." *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981).  Consent decrees simultaneously invoke the Court's Article III powers and embody private negotiations between the parties.  *Local No. 93*, 478 U.S. at 519 ("[I]t is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree.").  As such, a consent decree "places the power and prestige of the court behind the compromise struck by the parties." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983); *see also United States v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:24-cv-722-BJB, 2024 WL 6978284, at *2 (W.D. Ky. Dec. 28, 2024) ("Unlike a judgment following a trial or briefing, a consent decree is handed to—not handed down by—the judge.")

**A**

Courts in this circuit and elsewhere have, from time to time, raised both jurisdictional and remedial concerns inherent in consent decrees.  *See e.g. Lexington Ins. Co. v. Ambassador Grp. LLC*, 581 F.Supp.3d 863, 866 (W.D. Ky. 2021) ("The nature of the parties' request—no doubt welcome for its efficiency and amicability—puts a court in a somewhat uncomfortable position[.]")  In spite of these concerns, the Sixth Circuit instructs that a Court has jurisdiction to enter a consent decree so long as the proposed decree: (1) "spring[s] from and serve[s] to resolve a dispute within the court's subject matter jurisdiction," (2) "comes within the general scope of the case made by the pleadings," and (3) "further[s] the objective of the law upon which the complaint was based." *Benalcazar v. Genoa Twp.*, 1 F.4th 421, 425 (6th Cir. 2021) (quoting *Local No. 93*, 478 U.S. at 525).[4]  Although in apparent tension with the requirement that "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed," for purposes of this inquiry, Courts tend to treat the filing of the complaint as the operative timeframe.  *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *Lexington Ins. Co*, 581 F.Supp.3d at 868; *Bureau of Consumer Fin. Prot. v. Fifth Third Bank, N.A.*, No. 1:21-cv-262, 2024 WL 3451080 (S.D. Ohio July 18, 2024) (evaluating the complaint to determine whether the Court had jurisdiction to enter a consent decree).

Here, the proposed consent decree fulfills the jurisdictional criteria.  First, the proposed consent decree resolves a dispute within this Court's subject matter jurisdiction.  District courts have federal question jurisdiction over claims that allege state regulations are void on preemption

---

[4] Notwithstanding the Sixth Circuit's near universal approval of consent decrees when the issue has arisen, the Court has warned of the "perniciousness of consent decrees" to the extent that they "limit the rights of third parties" and "risk improperly depriving future officials of their designated legislative and executive powers." *United States v. Michigan*, 68 F.4th 1021, 1023 n.2 (6th Cir. 2023) (citations omitted).  However, the Court "save[d] this issue for another day" given that neither party was challenging the legality of the consent decree. *Id.*

grounds and original jurisdiction over cases in which the United States is the plaintiff. 28 U.S.C. §§ 1331, 1345; *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus present a federal question which the federal courts have jurisdiction under 28 U.S.C. §1331 to resolve.").

At the hearing conducted in this matter, KSAT argued that the Court does not have Article III jurisdiction to enter the proposed consent decree. [R. 56 at 20-23.] Essentially, KSAT posits that because the Council and the United States now agree that Section 8(4)(a) of the Tuition Assessment Regulation is preempted, there is no longer a live "case or controversy." *Id.* at 22. KSAT specifically noted that "normally parties settle, despite their disagreements," but here, the parties have not reached any compromise as evidenced by the proposed consent decree awarding the United States all of the relief for which it prayed. *Id.* at 21.

As a matter of prudential standing, the Supreme Court has certainly noted that a "friendly, non-adversary proceeding" in which a governmental entity does not defend its own enactment "introduce[s] a complication." *United States v. Windsor*, 570 U.S. 744, 756 (2013). The Court held, however, that even if the government agrees that its law is unconstitutional, so long as the government refuses to give that position effect, there is still a justiciable controversy between the parties. *Id.*; *see also INS v. Chadha*, 462 U.S. 919, 940, n. 12 (1983) ("Even though the government largely agreed with the opposing party on the merits of the controversy, we found an adequate basis for jurisdiction in the fact that the government intended to enforce the challenged law against that party.")

7

Here, despite the Council's agreement with the United States that its regulation is preempted, it continues to enforce the regulation.  As such, a justiciable controversy remains present.  Additionally, to the extent that "prudential considerations demand that the Court insist upon 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions,'" that purpose is served by allowing KSAT to intervene and defend the regulation.  *Windsor*, 570 U.S. at 760 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Next, the proposed consent decree resolves a dispute within the general scope of the case made by the pleadings.  The Amended Complaint alleges that Section 8(4)(a) of the Tuition Assessment Regulation is unconstitutional under the Supremacy Clause because it conflicts with both IIRIRA and PRWORA.  [R. 4 at 12-13.]  The proposed consent decree enjoins the enforcement of Section 8(4)(a) of the Tuition Regulation Assessment which resolves all of the allegations in the Amended Complaint.  [R. 24-1.]

And finally, the proposed consent decree furthers the objectives of both IIRIRA and PRWORA.  The stated objective of PRWORA and IIRIRA is to promote "self-sufficiency" as a basic principle of United States immigration law.  8 U.S.C. § 1601 ("It continues to be the immigration policy of the United States that. . .the availability of public benefits not constitute an incentive for immigration to the United States.")  The proposed consent decree serves this purpose by curbing one such public benefit for unlawful aliens in the Commonwealth of Kentucky.[5]  Accordingly, the proposed consent decree resolves a dispute properly before the Court and serves the purposes of the laws on which the Amended Complaint is based.

---

[5] KSAT posits that Congress did not intend to curb all public benefits, as evidenced by 8 U.S.C. § 1621(d) which allows States to provide public benefits to unlawful aliens by enacting a State law that affirmatively provides for such benefits. [R. 56 at 27.]  Point taken, but the proposed consent decree

**B**

Having determined that the Court has the authority to approve the proposed consent decree and that the proposed decree serves to resolve a dispute within the Court's jurisdiction, congruent with traditional equitable principles, the Court must consider whether the proposed decree is "fair, adequate, and reasonable, as well as consistent with the public interest." *United States v. Lexington-Fayette Urban Cnty. Gov't.*, 591 F.3d 484, 489 (6th Cir. 2010) (quoting *United States v. Cnty. of Muskegon*, 289 F.3d 569, 580-81 (6th Cir. 2002). "Protection of the public interest is the key consideration in assessing whether a decree is fair, reasonable and adequate." *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991). In line with these principles, the Court may not approve a proposed consent decree "which is illegal, a product of collusion, or contrary to the public's interest." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).

**1**

In *Williams*, the Sixth Circuit described a "suggested procedure" for approving consent decrees which involved preliminary approval, notice to interested parties, and a reasonableness determination following a fairness hearing. 720 F.2d at 920-21. Once the proposed consent decree has been "preliminarily approved," those opposed to entry of the decree face a "heavy burden of demonstrating that the decree is unreasonable." *Id.* at 921. In both the hearing in this matter and in briefing, there has been some suggestion that the Court has already preliminarily approved the proposed consent decree, and the hearing conducted on March 12, 2026, served as the "fairness hearing." [*See* R. 56 at 29; R. 48 at 1.] The United States posits that KSAT now faces a "heavy burden" in demonstrating that the proposed consent decree is unreasonable. *Id.*

---

plainly serves the stated purpose of IIRIRA and PRWORA which is to reduce unlawful aliens' reliance on public benefits generally.

However, that standard is not entirely pertinent to the posture of this case. First, and most importantly, the Court has not preliminarily approved the consent decree, so the hearing was not a "fairness hearing," and there was no accompanying "presumption of reasonableness." *Williams,* 720 F.3d at 921. In fact, when the Court set this matter for a hearing, it indicated that the purpose of the hearing was to address "inherent tension" posed by consent decrees. [R. 52.]

Second, the suggested procedure in *Williams* was intended primarily for institutional reform cases—like *Williams* and nearly every case cited therein—in which the plaintiffs were not only binding themselves, but also adjudicating the rights of others who were not parties to the proposed consent decree. 720 F.3d at 921 (referencing a "plaintiff class"); *see also Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1015 (7th Cir. 1980) (noting that the policy objectives of the Fair Housing Act favored voluntary compliance, so objectors faced a heavier burden in showing unreasonableness).

Here, the United States seeks only to adjudicate its own rights under the Constitution. In such cases, the suggested procedure in *Williams* is not applicable to this case because it would not serve the purpose for which it was intended. *See e.g. Meadwestvaco Corp. v. United States*, No. 1:10-cv-250, 2011 WL 679309 (E.D. Tenn. Feb. 16, 2011); *Chavez-DeRemer v. Azteca Restaurante Mexicano, Inc.*, No. 5:25-cv-1463, 2025 WL 2521146 (N.D. Ohio Sept. 2, 2025). Accordingly, there is no presumption that the proposed consent decree here is reasonable, nor does KSAT face a "heavy burden" of demonstrating that it is not.

**2**

Before considering whether the proposed consent decree is fair, adequate, and reasonable, the Court must consider whether the proposed consent decree "is illegal, a product of collusion, or contrary to the public's interest." *Williams*, 720 F.2d at 920. A consent decree that

10

"contemplates a violation of [State] law" is illegal and may not be approved by the Court.

*Pedreira v. Sunrise Children's Servs., Inc.*, 826 Fed. Appx. 480, 487 (6th Cir. 2020) (quoting

*Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 342 (7th Cir. 1987)).  To that end, "Courts

must be especially cautious when state officials seek to achieve by consent decree what they

cannot achieve by their own authority."  *Pedreira*, 826 Fed. Appx. at 487 (quoting *Coalition to

Defend Affirmative Action v. Granholm*, 473 F.3d 237, 245 (6th Cir. 2006)).

Under Kentucky law, in order for an administrative agency to repeal a regulation, the

agency must promulgate a new regulation which has the effect of repealing the current

regulation.  Ky. Rev. Stat. Ann. § 13A.310(3).  Because the process involves promulgating a new

regulation, the agency must follow the typical promulgation procedures, including publication in

the Kentucky Administrative Register, holding a public hearing, and accepting written

comments.  Ky. Rev. Stat. Ann. § 13A.270.  Consequently, the Council on Postsecondary

Education does not have the authority to summarily strike one of its regulations, or otherwise

declare it invalid, without following the statutorily proscribed procedures.  The Council indicated

as much at the hearing:

> Court: So, if the Council has a regulation and it decides it's no longer needed, or they need to change it, or they, for some reason, think it's now preempted by federal law, absent a consent decree, what recourse do they have?
>
> Council: They can promulgate a new regulation that has to go through a process that's about a minimum of about a six-month process to put it out for public comment. It goes before a reg[ulatory] review in the legislature, it's a pretty lengthy process, but that's how they promulgate a regulation.
>
> Court: Could the Council just simply rescind the regulation?
>
> Council: No. They can issue emergency regulations in certain situations. I don't think that would apply here. But, I mean, they're required by statute to have the criteria for residency, so I don't think they could just rescind it without having another one to replace it.

[R. 56 at 8-9.]  It is undisputed that the statutory procedures for repealing a regulation have not been followed in the present case.  The Council has not proposed a new regulation which would have the effect of repealing Section 8(4)(a) of the Tuition Assessment Regulation, nor has it indicated that it plans to do so.  These statutorily required procedures have a purpose in the functioning of Kentucky's government and are not mere formalities that can be hurdled by judicial order.

Furthermore, Kentucky law provides that "[a]n administrative body shall not by internal policy, memorandum, or other form of action. . . modify. . .expand upon or limit a statute or administrative regulation. . .Any administrative body memorandum, internal policy, or other form of action violative of this section or the spirit thereof is null, void, and unenforceable."  Ky. Rev. Stat. Ann. § 13A.130.  As noted in *Pedreira*, "Kentucky law and courts have a significantly limited view of an agency's authority."  826 Fed. Appx. at 488.  "Administrative agencies must strictly adhere to the standards, policies, and limitations provided in the statutes vesting power in them." *Portwood v. Falls City Brewing Co.*, 318 S.W.2d 535, 537 (Ky. 1958).  "An administrative agency, as a purely statutory creation, possesses no inherent authority and derives all of its rule-making authority from legislative grant." *Fisher v. Commonwealth*, 403 S.W.3d 69, 78 (Ky. Ct. App. 2013).  "Where reasonable doubt exists concerning the proper scope of an administrative agency's power, the question must be resolved against the agency to limit its power." *Id.*

As such, the Council, as a purely statutory creation, must point to a source of authority that allows it to enter into an agreement that has the effect of immediately rescinding its regulation. *Id.*  The Council has pointed to no such grant of authority.  At the hearing, the Council stated that its source of authority to enter into the consent decree derives from its

12

authority to promulgate regulations that determine residency criteria. [R. 56 at 8.] Assuming that the proposed consent decree could even be said to be "determining residency criteria;" that grant of authority still requires compliance with Ky. Rev. Stat. Ann. § 13A.270. *Public Serv. Comm'n of Ky. v. Attorney Gen. of the Commonwealth*, 860 S.W.2d 296, 298 (citing *Union Light, Heat & Power Co. v. Public Serv. Comm'n, Ky.*, 271 S.W.2d 361 (Ky. 1954)) ("When a statute prescribes the procedures that an administrative agency must follow, the agency may not add or subtract from those requirements.").

Consent decrees have been said to be both "a voluntary settlement agreement which could be fully effective without judicial intervention" and "a final judicial order." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Williams*, 720 F.2d at 920). By contrast, in the instant matter, the proposed consent decree is only the latter. The United States and the Council could not accomplish what the consent decree asks for – immediate invalidation of the challenged provision of the Tuition Assessment Regulation – absent judicial intervention. [*See* R. 56 at 8-9.] In fact, both the United States and the Council represent that this is the very reason they have moved for entry of a consent decree. *Id.*; [R. 56 at 16-17.] Both parties indicated that in absence of the consent decree, the regulation would remain effective, at least for the time being.

While public policy favors voluntary settlement of lawsuits, it does not compel the Court to approve entry of a proposed consent decree that contravenes state law. "Parties can only agree to that which they have the power to do outside of litigation." *Perkins*, 47 F.3d at 216. "An alternation of the statutory scheme may not be based on consent alone; it depends on an exercise of federal power, which in turn depends on a violation of federal law." *Kasper*, 814 F.2d at 342.

13

Here, the terms of the instant proposed consent decree could not be accomplished outside of litigation, and thus the proposed decree is at odds with state law.

Many other Circuits have reached the same conclusion. *Perkins v. City of Chicago Heights*, 47 F.4th 212, 216 (7th Cir. 1995) ("[Parties] cannot consent to do something together that they lack the power to do individually."); *League of Residential Neighborhood Advocates v. City of Los Angeles*, 498 F.3d 1052, 1057 (9th Cir. 2007) (holding that the City's general authority to settle lawsuits did not empower it to circumvent procedures proscribed by law); *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 269-70 (8th Cir. 2011) (holding that a municipality could not enter into a consent decree that required it to act outside of the procedures authorized by law); *Cleveland Cnty. Ass'n for Gov't by People v. Cleveland*, 142 F.3d 468, 477 (D.C. Cir. 1998) (holding that a state election board did not have the authority to enter into a consent decree when it did not follow the "statutory mandated scheme."); *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997) (holding that parties to a consent decree "could not agree to terms which would exceed their authority and supplant state law.").

This conclusion becomes even more evident when considering the typical advantages of a consent decree. Parties may voluntarily terminate litigation on mutually agreeable terms by entering into a settlement agreement, which is binding as a contract between the parties. *Price v. Kroger*, No. 14-cv-257-JMH, 2015 WL 1467679, at *2 (E.D. Ky. Mar. 30, 2015). In that case, if a party violates the settlement agreement, the aggrieved party may bring an action for breach of contract. *See id.* Ordinarily, parties prefer consent decrees over settlement agreements because a consent decree allows the aggrieved party to initiate contempt proceedings before the Court that entered the consent decree. *Hazen ex rel. LeGear v. Reagen*, 208 F.3d 697, 699 (8th Cir.2000) (citing *Benjamin v. Jacobson*, 172 F.3d 144, 157 (2d Cir.1999)) ("[C]onsent decrees. . .are

14

enforceable through the supervising court's exercise of its contempt powers, and private settlements [are] enforceable only through a new action for breach of contract.")

Here, if the United States and the Council entered into a settlement agreement by which the Council agreed to repeal Section 8(4)(a), that would require compliance with Ky. Rev. Stat. Ann. § 13A.310(3) and, at least in theory, the regulation could be repromulgated by a future administration, but the regulation would no longer be enforced. Of course, the result would not be instantaneous, but ultimately the end result would be more or less the same. That said, the parties could not enter into a binding agreement that the Council will immediately rescind the regulation—not without violating Kentucky law, anyway. *See* Ky. Rev. Stat. Ann. 13A.310(3). The parties also could not agree on their own that the Council could never again enforce the regulation. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) ("A State, in the ordinary course, depends upon successor officials, both appointed and elected, to bring new insights and solutions. . .") They need judicial intervention to accomplish that.

To that end, the advantage of a consent decree in the instant matter is not the difference between how the agreement will eventually be enforced; it is the difference between whether the agreement is enforceable *at all*. And of course, "what cannot be done directly cannot be done indirectly." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (citing *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867)). Consequently, because the United States and the Council have agreed to terms which they do not have the power to accomplish outside of litigation, the proposed consent decree is in conflict with Kentucky law.

15

C

The conclusion that the proposed consent decree violates Kentucky law does not end the inquiry, however.  Even a proposed consent decree that violates state law must be entered if the "remedy is *necessary* to rectify a *violation of federal law*."  *Perkins*, 47 F.3d at 216 (emphasis in original).  Because the proposed consent decree in the instant case purports to resolve a violation of federal law, the Supremacy Clause directs that the "state law cannot prevent a necessary [federal] remedy."  *St. Charles Tower, Inc.*, 643 F.3d at 271-72 (quoting *Perkins*, 47 F.3d at 216), *accord League of Advocates*, 498 F.3d at 1058.  For that reason, the Court must inquire, to some extent, into the merits of this case.

Ordinarily, Courts are not obligated to, and in fact discouraged from, conducting a searching merits analysis when determining whether to adopt a proposed consent decree.  Instead, Courts are typically instructed to consider the merits only insofar as that consideration illuminates the fairness and reasonableness inquiry.  *Williams*, 720 F.2d at 920 ("A court has no occasion to resolve the merits of the disputed issues of the factual underpinnings of the various legal theories advanced by the parties.")

At the hearing in this matter, the parties expressed differing views regarding whether the Court needed to or should render a merits decision.  The Council indicated that that it "would like some guidance" on the preemption issue.  [R. 56 at 11.]  The United States stated that it would prefer a merits ruling, but argued that Sixth Circuit precedent did not require it.  *Id.* at 12.  KSAT argued that the Court needed to conduct a merits analysis to determine the United States' likelihood of success on the merits, to the extent that it was relevant in determining whether the proposed consent decree is reasonable.  *Id.* at 14.  Here, the Court finds that it must conduct a merits analysis because the proposed consent decree both conflicts with state law, but also

16

purports to remedy a violation of federal law.  With that in mind, the Court turns its attention to the merits.

The United States alleges in its Amended Complaint that Section 8(4)(a) violates federal law in two ways.  First, it alleges that Section 8(4)(a) is preempted by 8 U.S.C. § 1623(a) which prohibits states from offering post-secondary benefits to unlawful aliens on the basis of residence.  [R. 4 at 13.]  Second, the United States contends that Section 8(4)(a) violates 8 U.S.C. § 1621(d) which allows states to extend postsecondary benefits to unlawful aliens only through the enactment of a State law.  While the Motion for Entry of Consent Judgment only references 8 U.S.C. § 1623(a), the proposed consent decree itself does not reference either provision.  [R. 24; R. 24-1.]  The proposed decree simply states that Section 8(4)(a) "violates the Supremacy Clause and is invalid."  [R. 24-1.]  Thus, a finding that Section 8(4)(a) conflicts with either § 1623(a) or § 1621(d) would permit entry of the proposed consent decree.

Under PRWORA, an unlawful alien may not be eligible for any State or local public benefit, which is statutorily defined to include "post-secondary" benefits.  8 U.S.C. §1621(a), (c). The exception to this general rule states, "[a] State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility."  8 U.S.C. § 1621(d). The United States alleged in its Amended Complaint that Section 8(4)(a) violates §1621(d) because it is a regulation, not a state law.  [R. 4 at 13.]  KSAT retorts that under Kentucky law, administrative regulations have the full force and effect of law, so Section 8(4)(a) complies with the directives of § 1621(d).  [R. 43 at 16.]  Thus, resolution of this issue turns on the meaning of "State law" in 8 U.S.C. § 1621(d).

17

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (1975) (Powell, J., concurring). It is axiomatic that, absent an indication to the contrary, Congress is presumed to use words "in their ordinary and usual sense, and with the meaning commonly attributed to them." *Baum v. Madigan*, 979 F.2d 438, 441 (6th Cir. 1992) (quoting *Caminetti v. United States*, 242 U.S. 470, 486 (1917)). It follows then that when Congress uses the phrase "State law," the presumption is that it meant "State *law*," and not some other kind of rule. *Baltimore & Ohio R. Co. v. City of Piqua, Ohio*, No. C-3-85-312, 1986 WL 8254, at *5 (S.D. Ohio June 30, 1986) ("To regulate by *law* would ordinarily be understood to mean by passing a *statute*.") (emphasis added).

This presumption is confirmed by the text, context, and overall purpose of the statute. *See Kokoszka v. Belford*, 417 U.S. 642, 650 (1973) (looking not only to the text in general, but also the objects and policy behind its enactment). First, the title of 8 U.S.C. § 1621 reads, "Aliens who are not qualified aliens or nonimmigrants ineligible for State and local public benefits." 8 U.S.C § 1621. In harmony with the title, the statute first provides a general rule that certain unlawful aliens are ineligible for State and local public benefits . 8 U.S.C. § 1621(a). The statute then provides exceptions for certain State or local public benefits, such as assistance with emergency medical conditions. 8 U.S.C. § 1621(b). Then, in § 1621(d), Congress provides a limited exception from its general rule: States may extend public benefits to unlawful aliens only through the enactment of a State law. 8 U.S.C. § 1621(d).

The Court finds that this exception was intended to be narrow, and should not be construed any broader than its plain text. As the United States points out, §1621(d) was part of an "overall Congressional scheme to reduce an illegal alien's access to public benefits," as

18

evidenced by the stated purpose in 8 U.S.C. § 1601.  [R. 48 at 7.]  Taking a closer look at the statute's stated objectives, Congress first notes that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country earliest immigration statutes."  8 U.S.C. § 1601(1).  Congress goes on to say that "it continues to be the immigration policy of the United States that aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families[.]"  *Id.* at (2)(A).  Congress then noted its concerns regarding unlawful aliens burdening the public benefits system and specifically noted that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits."  *Id.* at (4), (6).

Against this backdrop, Congress clearly intended 8 U.S.C. § 1621(a) to serve as a broad prohibition and § 1621(d) as a limited exception.  Aside from the stated purpose, the text of the statute also confirms this conclusion.  The statute provides that a State may grant a public benefit to an unlawful alien "*only* through the enactment of a State law. . ."  8 U.S.C. § 1621(d).  The word "only" is clearly a limiting descriptor, being defined as "solely or exclusively."  *Only*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/only [https://perma.cc/7W 4K-55B5] (last visited March 27, 2026).  Thus, Congress intended that the sole and exclusive means by which a State may provide public benefits to an unlawful alien is through enactment of a State law.

Furthermore, in other places in the United States Code, Congress defined "State law" more broadly, to include regulations and other forms of legislative output.  For example, under the Employee Retirement Income Security Act (ERISA), Congress specifically defined "State law" to include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State."  29 U.S.C. § 1144(c)(1).  By contrast, "State law" is not defined in

19

PRWORA, IIRIRA, or the Immigration Nationality Act.  *See* 8 U.S.C. § 1101.  As such, the

Court should not infer that Congress intended to include regulations as a proper means to satisfy

§ 1621(d) when elsewhere it specifically expanded the definition of State law to include

regulations, and has not done so here.

Certainly, as KSAT notes, properly promulgated regulations in Kentucky have the force

and effect of law.  *Hughes v. UPS Supply Chain Solutions, Inc.*, 677 S.W.3d 273, 280 (Ky.

2003).  But having the force and effect of law does not convert a regulation into a State law, as

relevant here, nor is the distinction without any difference.  Regulations differ from laws in

several ways, most notably how they come into effect and who votes for their passage.  In

Kentucky, State laws are passed upon receiving at least two-fifths of the votes of both the

Kentucky Senate and the Kentucky House of Representatives, and a majority of the members

voting.  Ky. Const. §46.  The law is then subject to presentment to the Governor.  Ky. Const.

§88.  Regulations, on the other hand, are promulgated by agencies, which, at least in the instant

matter, are predominantly comprised of members appointed by the Governor, subject to certain

conditions.  *See* Ky. Rev. Stat. Ann. § 164.011.  Regulations in Kentucky are of course proposed

by the agency and subject to notice and comment rulemaking, but they are not enacted by elected

officials, nor are they subject to presentment.  Ky. Rev. Stat. Ann. § 13A.270.  It follows then

that State laws more aptly represent the will of the people.

Accordingly, the Court finds that Congress intended for States to act by law rather than

by regulation, for purposes of complying with § 1621(d).  In carving such a narrow exception to

its general rule, Congress would have necessarily intended for such enactments to follow the

legislative process of a State law, and create the accompanying heightened democratic

accountability.  In reaching this conclusion, the Court casts no doubt on the force and effect of

Kentucky regulations, nor does it seek to diminish the importance of Kentucky's regulatory framework in the functioning of the Commonwealth's government. In fact, the Court unequivocally agrees with well-established precedent that properly promulgated regulations have the force of law in Kentucky. But there are important distinctions between State laws and regulations, and because of those distinctions, the Court finds that in this narrow context, when Congress stated, "only through the enactment of a State law," it meant "only through the enactment of a State law." Because Section 8(4)(a) is not a State law, it is invalid as conflicting with federal law.

Having determined that the proposed consent decree is necessary to remedy a violation of federal law, the Court must approve it, despite its tension with Kentucky state law. Additionally, the Court need not, and in fact should not, make any further determination on the merits. "Supreme Court precedent makes clear that courts should avoid unnecessary adjudication of constitutional issues." *Adams v. City of Battle Creek*, 250 F.3d 980, 986 (6th Cir. 2001) (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass on a constitutional question, although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."). Although both grounds ultimately require the Court to decide a constitutional question, the §1621(d) ground is undoubtedly narrower. To that end, the Court finds it prudent to refrain from wading into the ultimate § 1623(a) preemption issue and rests its decision only on the foregoing grounds.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Joint Motion for Entry of Consent Judgment **[R. 24]** is **GRANTED**;

21

2. The Proposed Consent Decree **[R. 24-1]** is **ADOPTED**;

3. The Court hereby **DECLARES** that 13 KAR 2:045, Section 8(4)(a) (eff. 6-22-2022), violates the Supremacy Clause and is invalid;

4. The Court also hereby **PERMANENTLY ENJOINS** the Kentucky Council on Postsecondary Education, and Aaron Thompson, in his official capacity as the President of the Kentucky Council on Postsecondary Education, as well as their successors, agents, and employees, from enforcing 13 KAR 2:045, Section 8(4)(a) (eff. 6-22-2022); and

5. Other than to the extent the Court retains jurisdiction to enforce this Order, this action is hereby **DISMISSED**, each party to bear their own costs and fees.

This the 31st day of March, 2026.

Gregory F. Van Tatenhove
United States District Judge